T.C. Memo. 2003-139

UNITED STATES TAX COURT

ALBERT DUDLEY THROWER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14625-92.               Filed May 15, 2003.

Albert Dudley Thrower, pro se.

<u>John M. Tkacik, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined the following

deficiency and additions to tax with respect to petitioner's 1988

Federal income tax:[1]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

|  | Additions to Tax | | |
| Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6654(a) |
| $1,020,626 | $255,156.50 | $51,031 | $65,550 |

The issues for decision are: (1) The amount, if any, of petitioner's 1988 unreported rental income; (2) whether petitioner had $3,400,351 of unreported income from illegal activities in 1988, as respondent determined; and (3) whether petitioner is liable for additions to tax.[2]

## FINDINGS OF FACT

When he petitioned this Court, petitioner was incarcerated at Allen Correctional Institute in Lima, Ohio.

During 1988, petitioner owned at least 141 rental properties in Akron, Ohio. Conducting business under the name of "College Rentals", 545 Grant Street, Akron, Ohio, he rented these properties mainly to college students.

In August 1988, the Akron, Ohio, Police Department arrested petitioner on charges of trafficking in marijuana. The arrest occurred in the apartment of one of petitioner's associates at 80 S. Portage Path, Akron, Ohio.

---

[2] On brief, petitioner has advanced various meritless arguments. For example, petitioner contends that the limitations period for assessing his 1988 tax liability has expired. Petitioner, however, failed to file a 1988 tax return; therefore, "the tax may be assessed * * * at any time." Sec. 6501(c)(3).

In February 1989, petitioner pleaded guilty to trafficking in marijuana and other related offenses. He received a prison term of 7 to 25 years and was ordered to forfeit 141 of his rental properties. See Thrower v. Anderson, No. 98AP-1152 (Ohio Ct. App. May 18, 1999); State v. Thrower, No. 14967 (Ohio Ct. App. July 31, 1991); State v. Thrower, 575 N.E.2d 863, 876-877, 879 (Ohio Ct. App. 1989).

For 1988, petitioner filed no Federal income tax return and paid no estimated taxes.

OPINION

1. Unreported Rental Income

In the notice of deficiency, respondent determined that in 1988 petitioner had $217,460 of unreported net rental income, representing $543,851 of gross rental income reduced by $98,501 of depreciation expense and $227,890 of other rental expenses.

In his petition, petitioner affirmatively acceded to these determinations.[3] At trial, petitioner offered into evidence a photocopy of a 1988 Form 1040, U.S. Individual Income Tax Return (the purported return), which he contended was "my 1988 tax

_____

[3] The petition states: "I do not contest the rental income and expenses." Moreover, petitioner failed to respond to respondent's requests for admissions, which set forth the same amounts of gross receipts, expenses, and depreciation attributable to his rental properties as contained in the notice of deficiency. Pursuant to Rule 90(c), petitioner is deemed to have admitted these matters. See Freedson v. Commissioner, 65 T.C. 333, 335-336 (1975), affd. 565 F.2d 954 (5th Cir. 1978).

return * * * signed under oath."  The purported return is dated September 8, 2002--2 days before trial.  On line 18 ("Rents, royalties, partnerships, estates, trusts, etc.") of the purported return, petitioner listed $445,354 of net rental income--a significantly greater amount than respondent had determined in the notice of deficiency--representing $1,212,140 of rents received, reduced by $98,499 of depreciation expense and $668,287 of other rental expenses.  On line 15 ("Other gains or (losses)") of the purported return, petitioner listed $2,283,273 of alleged losses which he contends resulted from "involuntary conversion" of his forfeited rental properties.

After trial, with leave of the Court, respondent filed an amendment to his answer, asserting an increased deficiency and additions to tax in conformity with the evidence that petitioner's 1988 net rental income is $445,352.[4]

Petitioner has not sought to retract or disavow his admissions on the purported return as to the amounts of his gross rental income, rental depreciation expense, and other rental expenses.  He argues, however, that his net rental income is more than offset by the $2,283,273 of losses that he claimed on the purported return.

---

[4] Respondent attributes to rounding the $2 difference between the amounts of net rental income indicated on the purported return and as calculated in the amended answer.

In his petition, petitioner did not raise the issue of losses allegedly resulting from the forfeiture of his rental properties. He did not seek to amend his petition to raise this issue, nor did he otherwise give proper notice before trial that he intended to raise it. Accordingly, the issue is not before the Court, and we will not consider it. See Frentz v. Commissioner, 44 T.C. 485, 490-491 (1965), affd. per order 375 F.2d 662 (6th Cir. 1967).

Even if the issue were properly before us, however, petitioner would not be entitled to the claimed losses. Petitioner failed to introduce any credible evidence to establish the amounts of the alleged losses or the year in which they might have been realized. Indeed, because the forfeitures occurred after petitioner's guilty plea in February 1989, they would not have given rise to any loss in 1988. See sec. 461(a); sec. 1.446-1(c)(1), Income Tax Regs. In any event, losses resulting from drug traffickers' asset forfeitures are disallowed as contravening clearly defined public policy.[5] See, e.g., Holt v.

_____

[5] On brief, petitioner suggests that the above-cited principle of public policy is nongermane here because his claimed losses did not result from a forfeiture related to drug trafficking but rather from a "breach of contract" as a result of a "reneged plea agreement." Contrary to petitioner's contentions, the Ohio Court of Appeals has repeatedly and consistently characterized the disposition of petitioner's 141 rental properties as a forfeiture related to his drug trafficking charges. See, e.g., State v. Thrower, No. 20615 (Ohio Ct. App. Mar. 13, 2002); Thrower v. Anderson, No. 98AP-1152 (Ohio Ct. App.
(continued...)

<u>Commissioner</u>, 69 T.C. 75, 79-81 (1977), affd. 611 F.2d 1160 (5th Cir. 1980); <u>Bailey v. Commissioner</u>, T.C. Memo. 1989-674, affd. without published opinion 929 F.2d 700 (6th Cir. 1991).

In conclusion, we hold that for 1988 petitioner had unreported net rental income of $445,352.

2. <u>Unreported Income From Illegal Activities</u>

In the notice of deficiency, respondent determined that during the first 8 months of 1988, petitioner received $3,823,364 of "unreported funds by illegal means". To arrive at this figure, respondent first determined that petitioner's alleged illegal receipts for the month of August 1988 totaled $477,920.50; respondent then projected petitioner's alleged

---

[5](...continued)
May 18, 1999); <u>State v. Thrower</u>, 621 N.E.2d 456, 457 (Ohio Ct. App. 1993); <u>State v. Thrower</u>, No. 14967 (Ohio Ct. App. July 31, 1991); <u>State v. Thrower</u>, 610 N.E.2d 433, 434 (Ohio Ct. App. 1991); <u>State v. Thrower</u>, 575 N.E.2d 863, 876-877, 879 (Ohio Ct. App. 1989).

Petitioner also seeks to assert in this action a breach of contract "counterclaim" against respondent for "$250 million/specific performance as to property". We lack authority to address such a claim. The Tax Court is a court of limited jurisdiction and may exercise only the power conferred by statute. See sec. 7442; <u>Neilson v. Commissioner</u>, 94 T.C. 1, 9 (1990). Petitioner's "counterclaim" falls outside that jurisdiction.

illegal receipts for the first 8 months of 1988 as being 8 times this amount.[6]

If a taxpayer keeps inadequate records, the Commissioner may compute the taxpayer's income by any indirect method that is reasonable in light of all the facts and circumstances.  See United States v. Walton, 909 F.2d 915, 918 (6th Cir. 1990); see also United States v. Fior D'Italia, Inc., 536 U.S. 238, 243 (2002) (stating that IRS assessment authority under section 6201(a) is not exceeded "when the IRS estimates an individual's tax liability--as long as the method used to make the estimate is a 'reasonable' one").  If necessary, the Commissioner may reconstruct a taxpayer's income, provided the result is reasonable and substantially correct. Mendelson v. Commissioner, 305 F.2d 519, 521-522 (7th Cir. 1962), affg. T.C. Memo. 1961-319; Cebollero v. Commissioner, T.C. Memo. 1990-618, affd. 967 F.2d 986 (4th Cir. 1992).  The Commissioner's income reconstruction need not be exact, but it must be "reasonable in light of all surrounding facts and circumstances."  Schroeder v. Commissioner, 40 T.C. 30, 33 (1963).

Respondent reconstructed petitioner's alleged illegal income using the projection method, which "has received widespread judicial approval."  Jackson v. Commissioner, 73 T.C. 394, 403 (1979).  In general, the projection method entails extrapolating income for a

---

[6] In the notice of deficiency, respondent also allowed petitioner a $423,013 deduction for cost of goods sold relative to the alleged illegal income.

taxable period from records of income produced by the activity in question over some shorter period.  See, e.g., <u>United States v. Janis</u>, 428 U.S. 433, 437 (1976) (upholding projection of 77 days' income based upon 5 days' gross proceeds as indicated in wagering records); <u>United States v. Besase</u>, 623 F.2d 463, 468 (6th Cir. 1980) (upholding reconstruction of income based on 4 days' gross gambling receipts as indicated on adding machine tapes).  Obviously, the reliability of the results obtained under this method depends upon the reliability of the starting point; i.e., the adequacy of the data used to extrapolate the projected income.  Cf. <u>Thomas v. Commissioner</u>, 223 F.2d 83, 89 (6th Cir. 1955) ("'To be dependable, however, the [net worth] method requires a starting point, reasonably well established as accurate.'" (quoting <u>Gariepy v. United States</u>, 189 F.2d 459, 461 (6th Cir. 1951))).

In employing the projection method here, respondent used as his starting point petitioner's alleged illegal receipts for the month of August 1988.  To arrive at this starting point, respondent relied upon information derived from a notebook that the Akron Police Department allegedly seized from petitioner's briefcase upon his arrest at 80 S. Portage Path, in Akron, Ohio.

At trial, respondent sought to introduce into evidence certain photocopied pages (the photocopied pages) that respondent claimed to be a true copy of the notebook in question.  Respondent was unable

to account for the original notebook or for apparently missing pages of the exhibit.[7]

The photocopied pages show columns of numbers added and subtracted, accompanied by various marginal notations, at least some of which were made by law enforcement personnel or by respondent's examining agent. Throughout the photocopied pages are faint, illegible markings as might result from erasures. The notebook pages reproduced in the photocopied pages contain no identifiable direct or indirect references to petitioner.

Petitioner denies that any of the handwriting in the photocopied pages is his. At a pretrial hearing, in response to petitioner's inquiry on this point, respondent's counsel conceded that the handwriting in the photocopied pages is not petitioner's.[8] Although respondent's counsel belatedly attempted to retract this concession at trial, no competent evidence was offered to establish

---

[7] The photocopied pages are numbered C-4 through C-31. Respondent did not attempt to account for the apparently missing pages C-1 through C-3. Respondent's counsel explained only that the page numbers were "marked by Respondent * * * during examination".

[8] At trial the next day, respondent's counsel represented that he "misspoke" in making this concession and stated "I think I clarified that later on the record." The record reflects no such clarification intelligibly made. To the contrary, it reflects that respondent's counsel took no exception when on at least nine separate occasions during the remainder of the pretrial hearing, petitioner referred to what he--and the Court-- understood to be respondent's concession and stated that in light of it, he (petitioner) would forgo calling his own handwriting witness.

that any of the handwriting in the photocopied pages is petitioner's.

Respondent's sole witness was a former Akron Police Department officer who had been in charge of petitioner's criminal investigation and who, since leaving the Akron Police Department in 1991, has owned and operated his own consulting business. Respondent's witness acknowledged that some of the handwriting and markings in the photocopied pages were his own, apparently made in the course of his analyzing the notebook at some unspecified time and in unspecified circumstances. Respondent's witness (who was not present when petitioner was arrested and the notebook was allegedly seized) was unable to authenticate the photocopied pages or even to identify them satisfactorily.[9] Respondent established no chain of custody of the notebook or notebooks--a concern that gains in significance given that the photocopied pages appear to be an incomplete and corrupted version of the original document or documents.

Because of these various evidentiary infirmities, the Court sustained petitioner's objection to the admission of the photocopied pages into evidence. On brief, respondent has not sought to revisit this evidentiary ruling and appears to have abandoned any reliance

---

[9] Respondent's witness identified the photocopied pages as a true copy of a notebook seized from petitioner's briefcase at his arrest. Internal handwritten notations in the photocopied pages, however, identify approximately the last half of the photocopied pages as having been found at an address other than the place of petitioner's arrest.

on the photocopied pages.  Instead, respondent argues on brief that the reasonableness of his determination of the amount of petitioner's 1988 alleged illegal income is established by the testimony of respondent's witness.  At trial, the testimony on this point was as follows:

> [RESPONDENT'S COUNSEL:] * * * based on your experience as a police officer investigating narcotics activity, and your knowledge of Mr. Thrower's involvement in the marijuana trafficking, is it reasonable to determine that Mr. Thrower had receipts of $477,920 during the month of August '88?
>
> [RESPONDENT'S WITNESS:] That's correct.

In asking this leading question, respondent's counsel ostensibly sought to elicit expert opinion testimony on the basis of the witness's specialized knowledge as a former police officer, notwithstanding that respondent's witness was never formally offered as an expert witness.[10]  Cf. Chagra v. Commissioner, T.C. Memo. 1991-366 ("It is well settled that the testimony of a drug enforcement officer with respect to the valuation of illegal narcotics is expert

---

[10] Upon commencing direct examination of respondent's witness, respondent's counsel stated that he was calling the witness as both a fact witness and an expert witness.  At the Court's direction, respondent's counsel commenced direct examination with questions relating to the witness's role as a fact witness.  Respondent's counsel gave no overt indication of ever moving to the expert witness phase of the testimony.

Before trial, pursuant to Rule 143(f) respondent submitted to the Court a copy of a putative expert report prepared by respondent's witness.  Respondent never offered the expert report into evidence.  The expert report made a fleeting appearance in the courtroom, however, when respondent's counsel produced the version of the photocopied pages he offered into evidence by physically detaching them from the expert report.

testimony."), affd. without published opinion 990 F.2d 1250 (2d Cir. 1993). Considering the testimony as expert opinion testimony, we do not believe it is properly based upon "sufficient facts or data" or upon "reliable principles and methods" applied "reliably to the facts" of this case, as required by rule 702 of the Federal Rules of Evidence.[11] Earlier in the trial, respondent's witness had testified that he had relied on the photocopied pages as the basis for his conclusion that petitioner's drug-related income for the first 8 months of 1988 should be computed as eight times approximately $477,000. At trial, it was apparent that in giving an affirmative response to the above-quoted leading question, respondent's witness was merely reaffirming his prior opinion, which was based on the photocopied pages. Having concluded that the photocopied pages are unreliable evidence which respondent has failed to adequately connect with petitioner, we conclude that the expert opinion

---

[11] Fed. R. Evid. 702 provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

testimony based thereon is also unreliable and entitled to little or no weight.[12]

In the final analysis, it is apparent, on the basis of all the evidence in the record, that respondent's deficiency figures for petitioner's alleged illegal income are predicated on the unreliable and inadmissible evidence of the photocopied pages. In Rosano v. Commissioner, 46 T.C. 681, 687 (1966), we observed that "the Commissioner's determination may often rest upon hearsay or other inadmissible evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence". By the same token, however, if the Commissioner undertakes to demonstrate the basis of his determination with unreliable evidence and in the process convinces the Court that his determination is arbitrary,

---

[12] In light of our conclusion that the testimony in question was proffered as expert testimony, based on "specialized knowledge" of respondent's witness as a former police officer, it follows that the testimony is not admissible as opinion testimony by a lay witness under Fed. R. Evid. 701 (providing that opinion testimony by lay witnesses is limited to opinions that are not based on, among other things, "scientific, technical, or other specialized knowledge within the scope of Rule 702."). Even if we had concluded, however, that the opinion testimony in question was not based on specialized knowledge within the scope of Fed. R. Evid. 702, we would nevertheless disregard the testimony as improper opinion testimony by a lay witness, in that respondent's witness failed to establish a reliable factual predicate for his opinion testimony. See Chagra v. Commissioner, T.C. Memo. 1991-366, affd. without published opinion 990 F.2d 1250 (2d Cir. 1993); see also United States v. Williams, 212 F.3d 1305, 1310 (D.C. Cir. 2000) ("to admit lay opinion evidence rationally based on the witness's perception, a sufficient factual foundation must exist").

then the Government may be "elevated on its own powder charge". Jackson v. Commissioner, 73 T.C. at 403. In that event, "the burden is no longer on petitioner to show that he owes nothing, or the correct amount, if any, that he does owe." Id. (citing Helvering v. Taylor, 293 U.S. 507 (1935)); see Harp v. Commissioner, 263 F.2d 139, 141 (6th Cir. 1959) ("the Commissioner's determination is presumed correct, but if error is shown, the presumption disappears and the Commissioner then has the burden of proving the correctness of his determination, or at least the correct amount actually due."), affg. in part, revg. in part and remanding T.C. Memo. 1957-105.

Having admitted that he derived his deficiency figures for petitioner's alleged illegal income from the photocopied pages and having undertaken at trial to establish the reasonableness of his determination on that basis, respondent has in the process inadvertently convinced us that his deficiency figures were unreliably derived. In particular, respondent's belatedly retracted admission that the photocopied pages (which respondent has not otherwise adequately connected with petitioner) are not in petitioner's handwriting seems plainly inconsistent with the basis of respondent's reconstruction of petitioner's income.

Taxpayers may not avoid the imposition of legally due taxes by concealing facts, but neither may the Commissioner base his determination on a "'strong underlying element of guess work.'"

Jacobs v. Commissioner, T.C. Memo. 1974-73 (quoting Polizzi v. Commissioner, 265 F.2d 498, 502 (6th Cir. 1959), affg. in part and revg. in part T.C. Memo. 1957-159).  In the instant case, as in Thomas v. Commissioner, 223 F.2d at 90, respondent's reconstruction of petitioner's alleged illegal income may have the "inviting quality of apparent exactitude" but ultimately proves conjectural. Cf. Jackson v. Commissioner, supra at 403 ("the elaborate construct set out in the deficiency notice, based solely as it was on a secondhand report of peripheral statements made by an unreliable informant, turns out to be sheer gossamer").  We conclude that respondent's deficiency figures were so arbitrarily derived as to negate any presumption of correctness.  The record provides no reliable basis for estimating petitioner's alleged illegal income. Accordingly, respondent's determination with respect to this issue is not sustained.

3.  Additions to Tax

a.  Addition to Tax for Failure To Timely File a Return

Respondent determined that petitioner is liable for the section 6651(a)(1) addition to tax for failure to timely file his 1988 Federal income tax return.  Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer establishes that the failure "is due to reasonable cause and not due to willful neglect".  A delay is due to reasonable cause if "the taxpayer exercised ordinary business care and prudence and was

nevertheless unable to file the return within the prescribed time". Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

It is undisputed that petitioner failed to timely file his 1988 tax return. Petitioner alleges, however, that he was unable to timely file his tax return because he was incarcerated and because his business records were confiscated after his arrest.

The mere fact that petitioner was incarcerated when his return was due is not reasonable cause for his failure to timely file. Llorente v. Commissioner, 74 T.C. 260, 268-269 (1980), affd. in part, revd. in part on other grounds and remanded 649 F.2d 152 (2d Cir. 1981); Labato v. Commissioner, T.C. Memo. 2001-243. Nor is the unavailability of records generally reasonable cause for failure to file a timely return. See Young v. Commissioner, T.C. Memo. 1989-480, affd. without published opinion 937 F.2d 609 (6th Cir. 1991). Nothing in the record suggests that petitioner applied for an extension of time to file his 1988 return; petitioner has not shown that he could not have prepared a timely 1988 return with a reasonable degree of accuracy on the basis of the information available to him as of the due date of that return. See Cook v. Commissioner, T.C. Memo. 1999-50. Petitioner has not established that his failure to timely file his return was due to reasonable cause. Therefore, we hold that petitioner is liable for the section 6651(a)(1) addition to tax with respect to the deficiency attributable to his unreported net rental income.

b.  <u>Addition to Tax for Negligence</u>

Respondent determined that petitioner is liable for the section 6653(a)(1) addition to tax for an underpayment attributable to negligence or disregard of rules or regulations.  In this context, negligence is "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" <u>Midwest Indus. Supply, Inc. v. Commissioner</u>, T.C. Memo. 1996-130 (quoting <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985)), affd. without published opinion 125 F.3d 855 (6th Cir. 1997).

Petitioner does not contend that he paid his 1988 tax liability.  He has failed to show that his underpayment was not attributable to negligence or disregard of rules or regulations. Therefore, we hold that petitioner is liable for the section 6653(a)(1) addition to tax with respect to the deficiency attributable to his unreported net rental income.

c.  <u>Addition to Tax for Underpayment of Estimated Tax</u>

Respondent determined that petitioner is liable for the section 6654(a) addition to tax for underpayment of estimated tax.

During the year at issue, petitioner filed no tax return and paid no estimated taxes.  Petitioner has not shown that any of the exceptions contained in section 6654(e) applies.  Accordingly, we hold that petitioner is liable for the section 6654(a) addition to tax with respect to the deficiency attributable to his unreported net rental income.

In reaching our holding, we have considered all arguments the parties have raised.  Arguments not addressed herein we have concluded are irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.